**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

THE BOEING COMPANY and
AURORA FLIGHT SCIENCES
CORPORATION,
A BOEING COMPANY,

          *Plaintiffs,*

   v.

VIRGIN GALACTIC, LLC,

          *Defendant*.

Case No. 24cv0456 CMH-LRV

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF RELEVANT FACTS ............................................. 2

    A.    The *Dawn* Mothership Program........................................... 2

    B.    Intellectual Property Provisions of The Master Agreement ................... 4

    C.    Boeing's Failed Performance Under the Master Agreement................. 5

    D.    The 262 Document.................................................................... 7

    E.    The Math Models ..................................................................... 8

    F.    Disposition of the 262 Document and the Math Models ................... 10

III.    LEGAL STANDARD.......................................................................... 10

IV.    ARGUMENT ...................................................................................... 11

    A.    Boeing Is Not Likely To Succeed on the Merits................................. 12

        1.    Boeing Is Not Likely To Prevail on its Trade Secret Claims. ................. 12

            i.    The 262 Document and the Math Models are owned by or licensed to Virgin Galactic........................................... 13

            ii.    Boeing did not take reasonable measures to protect the alleged confidentiality of the Math Models from Virgin Galactic. ...................................................................... 18

            iii.    Virgin Galactic did not misappropriate the alleged trade secrets.......................................................................... 21

        2.    Boeing Has Not Demonstrated a Likelihood of Success On Its Breach of Contract Claim. ........................................................ 23

            i.    Virgin Galactic did not breach the Master Agreement ............... 23

            ii.    Boeing has not been harmed by Virgin Galactic's possession of the Math Models and 262 Document. ................... 24

    B.    Boeing Cannot Show Irreparable Harm................................................ 25

        1.    Boeing Is Not Harmed If Virgin Galactic Develops *Dawn* Without Boeing .................................................................... 26

        2.    Boeing's Assertion of Irreparable Harm is Contradicted By Its Own Delay in Bringing Suit ................................................. 28

        3.    Virgin Galactic's Sequestration Negates any Imminent Harm............... 28

    C.    The Balance of Equities Favors Virgin Galactic, Not Boeing............................. 29

    D.    The Public Interest Does Not Favor An Injunction In This Case. ...................... 29

V.    CONCLUSION................................................................................... 30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Comput. Servs., Inc. v. MAI Sys. Corp.*,
    845 F. Supp. 356 (E.D.Va.1994) ................................................................. 19

*Aslanturk v. Hott*,
    459 F. Supp. 3d 681 (E.D. Va. 2020) ....................................................... 25

*Baer v. Nat'l Bd. of Med. Exam'r*,
    392 F. Supp. 2d 42 (D.Mass 2005) ............................................................ 28

*Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*,
    2022 WL 326473 (D. Md. Feb. 3, 2022) .................................................. 26

*Brown v. Bimbo Foods Bakeries Distrib., LLC*,
    2016 WL 9415418 (E.D. Va. Sept. 13, 2016) .......................................... 30

*Cablevision Sys. Corp. v. Verizon New York Inc.*,
    119 F. Supp. 3d 39 (E.D.N.Y. 2015) ........................................................ 28

*CACI, Inc. Fed. v. U.S. Navy*,
    674 F. Supp. 3d 257, 2023 WL 3570439 (E.D. Va. 2023) ................. 26, 27

*Cap. One Fin. Corp. v. Sykes*,
    2021 WL 2903241 (E.D. Va. July 9, 2021) ........................................ 24, 26

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985) ..................................................................... 28

*Cuddle Wit. Inc. v. Chan*,
    1989 U.S. Dist. LEXIS 14412 U.S.P.Q.2d (BNA) 1572, Copyright L. Rep. (CCH) q
    26, 507 (S.D.N.Y. Dec. 1, 1989) ............................................................... 28

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) .............................................................. 25, 28

*Hampton Rds. Connector Partners v. Land to Sand Site Servs., Inc*.,
    2023 WL 8539536 (E.D. Va. Oct 17, 2023) ............................................. 25

*Home Funding Grp., LLC v. Myers*,
    2006 WL 6847953 (E.D. Va. Dec. 14, 2006) ........................................... 26

*Johnson v. EquityExperts.org, LLC*,
    2020 WL 13605306 (E.D. Va. Jan. 21, 2020) .......................................... 30

*MicroStrategy Inc. v. Motorola, Inc.*,
    245 F.3d 335 (4th Cir. 2001) .................................................................... 10

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Myers v. Williams*,
819 F. Supp. 919 (D. Or. 1993) .................................................................................. 23

*N. Virginia Hemp & Agric. LLC v. Virginia*,
2023 WL 7130853 (E.D. Va. Oct. 30, 2023) ............................................................... 28

*NaturaLawn of Am., Inc. v. W. Grp., LLC*,
484 F. Supp. 2d 392 (D. Md. 2007) ............................................................................ 30

*OROS, Inc. v. Dajani*,
2019 WL 2361047 (E.D. Va. 2019) ............................................................................. 19

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ...................................................................................... 11

*Peraton, Inc. v. Raytheon Co.*,
2017 WL 11501665 (E.D. Va. Nov. 7, 2017) .............................................................. 26

*Prime Therapeutics LLC v. Beatty*,
354 F. Supp. 3d 957 (D. Minn. 2018) ......................................................................... 25

*Provident Pharm., Inc. v. Amneal Pharms., LLC*,
2008 WL 3843505 (Aug. 15, 2008 E.D. Virginia ) ..................................................... 28

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
872 F.2d 75 (4th Cir.1989) ......................................................................................... 28

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
575 F.3d 342 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010) ................. 25

*Salient CRGT, Inc. v. Sols. by Design II, LLC*,
2020 WL 3550008 (E.D. V.A. 2020) .......................................................................... 12

*Savor, Inc. v. FMR Corp.*,
2001 WL 541484 (Del. Super. Ct. 2001) ............................................................. 11, 18

*SDSE Networks, Inc. v. Mathur*,
2022 WL 18109791 (E.D. Va. Sept. 15, 2022) ........................................................... 26

*Southtech Orthopedics, Inc. v. Dingus*,
428 F. Supp. 2d 410 (E.D.N.C.2006) ......................................................................... 28

*Space Sys./Loral, LLC v. Orbital ATK, Inc.*,
306 F. Supp. 3d 845 (E.D. Va. 2018) ......................................................................... 11

*Stinnie v. Holcomb*,
77 F.4th 200 (4th Cir. 2023) ....................................................................................... 25

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
   840 A.2d 606 (Del. 2003) ................................................................................ 11, 23

*Winter v. NDRC, Inc.*,
   555 U.S. 7 (2008) ................................................................................................ 10

*Young Design, Inc. v. Teletronics Int'l, Inc.*,
   2001 WL 35804500 (E.D. Va. July 31, 2001) .................................................. 18, 19

**Statutes**

18 U.S.C. § 1836(b)(1) ............................................................................................ 11

18 U.S.C. § 1839(5)(B)(ii)(II) ................................................................................. 21

18 U.S.C.§ 1839(5)(B)(iii)(II) ................................................................................. 22

6 Del. C.§ 2001(2)(b)(2)(B) .................................................................................... 21

## I.     INTRODUCTION

In 2022, Virgin Galactic engaged The Boeing Company's wholly-owned subsidiary Aurora Flight Sciences Corporation ("Boeing")[1] to design a new aircraft, called *Dawn*, capable of ferrying a spacecraft to the edge of the atmosphere.  Virgin Galactic paid Boeing over $45 million under the development contracts, which expressly gave Virgin Galactic rights to intellectual property either developed under the contract or that was necessary for Virgin Galactic to be able to use Boeing's work-for-hire design.  After numerous missed deadlines and inadequate or missing deliverables from Boeing, Virgin Galactic was forced to end the relationship.

Virgin Galactic paid handsomely for intellectual property implementing or supporting the *Dawn* design under the contract.  But Boeing, disappointed with the loss of business and regretting the contractual transfer of certain IP, attempted to extract additional payment for its substandard work and demanded some of the IP back for free under a purported "trade secrets" theory, despite contractual terms establishing Virgin Galactic's rights to the materials.

Given this dispute, and without waiting for a demand from Boeing, Virgin Galactic voluntarily refrained from using the Disputed IP while the parties were negotiating a resolution of their disagreement and, in January 2024, Virgin Galactic removed copies of the Disputed IP from its systems and sequestered it with its legal team and told Boeing that it had done so.  Then, nearly ten months from its first demanded return of the disputed intellectual property, Boeing moved for the extraordinary remedy of a preliminary injunction.

---

[1] Although the contract in question was made by Virgin Galactic and Aurora, the Complaint was filed by both The Boeing Company and Aurora as plaintiffs, including as to the breach of contract claims and the trade secrets misappropriation claims, *see* D.I. 1, and the requested preliminary injunction is sought by both plaintiffs.  *See* D.I. 5.  Virgin Galactic thus files this opposition as to both plaintiffs, but reserves its right to defend the case as to The Boeing Company on the ground that The Boeing Company is not a party to the contract.

As explained in detail below, Boeing's motion should be denied.  First, Boeing cannot prevail on its trade secret and contractual claims because Virgin Galactic owns or has a license to the disputed intellectual property.  Second, Boeing cannot show an imminent risk of irreparable harm because Virgin Galactic has not disclosed the disputed intellectual property to any third parties and does not compete with Boeing in the space business.  Third, the balance of equities favors Virgin Galactic, which cannot use the preliminary design for which it has paid Boeing over $45 million without the disputed intellectual property.  And fourth, enforcing contractual provisions regarding ownership of intellectual property to affirm Virgin Galactic's rights is in the public interest—a preliminary injunction impairing those rights is not.

Moreover, as the voluminous pleadings, declarations, and other papers already filed by Boeing in the past few weeks demonstrate, this case is entirely inappropriate for resolution through a preliminary injunction. If the case remains in this District after the preliminary injunction motion is ruled on (Virgin Galactic has filed a corresponding declaratory judgment action in California), resolution should be obtained through the ordinary course of the proceedings—which will already be expedited if the case remains in the "Rocket Docket."

## II.    STATEMENT OF RELEVANT FACTS

### A.    The *Dawn* Mothership Program

*Dawn* is a next-generation launch/carrier aircraft using Virgin Galactic's successful *Eve* Mothership as a starting point. Ex. 2, Declaration of Lisa Morris ¶5. To scope the project before contracting with Boeing, Virgin Galactic commissioned a multi-million-dollar engineering study to determine the quality and completeness of *Eve's* engineering documentation and how much could be repurposed for *Dawn*. *Id*. ¶13.  Boeing later hired the same third-party engineers to repeat the study for themselves. *Id*.

With their common understanding of scope, the parties entered into a Master Agreement on July 4, 2022, whereby Boeing would provide engineering services for the design and manufacture of *Dawn*.  Ex. 3, Declaration of Daniele Lamboglia ¶5; D.I. 5-3. Virgin Galactic selected Boeing to provide these services based on Boeing's representations regarding its ability to deliver the promised services and work product in a timely manner that met a standard of quality consistent with commercial practices in the aerospace industry.  Morris ¶¶9-10.  Given Boeing's experience and what Virgin Galactic thought was a shared understanding of the scope of the contract, Virgin Galactic agreed to a flexible "time and materials" arrangement.

However, by spring 2023, Virgin Galactic realized that it could not rely on Boeing to perform the services to the level of quality required for the Mothership program, nor could Virgin Galactic rely upon Boeing to complete milestone deliverables within the timeframe that Boeing itself promised.  *Id.* ¶15.  Having already paid over $45 million and unwilling to invest more money in a failed development project, Virgin Galactic instructed Boeing to stop work under the contract. Lamboglia ¶10.

Although the Master Agreement governing the relationship between Virgin Galactic and Boeing contemplated that Boeing would design and build the *Dawn* Mothership from start to finish, the Master Agreement divided the development program into multiple task orders, beginning with Task Order 1, which would cover preliminary design of the aircraft, and culminating with the build, integration, and test of two operational flight vehicles in Task Orders 4-7. Lamboglia ¶5; Morris ¶9.  This structure was intended to reduce risk by providing natural exit points as the design reached key milestones such as preliminary design review (PDR) or critical design review (CDR).  Morris ¶¶10-11.  Both parties understood that either could decline to proceed with the next Task Order.  *Id.* ¶10; D.I. 5-2 at ¶16.  This meant that Virgin Galactic

was free to take the preliminary design package, for example, to a new contractor and have that new contractor take the aircraft through critical design and then manufacture, integrate, and test the aircraft.  Such arrangement were specifically discussed during the contract negotiations. Morris ¶10.

Consistent with Virgin Galactic's ownership of the design, the Master Agreement establishes that Virgin Galactic will be the "Design Authority" over the Program. Ex. 4, Declaration of Connie Soper ¶¶5-6; D.I. 5-3 at 2, 42, 50.  As the Design Authority, Virgin Galactic is solely responsible for the certification, licensing, and operation of the *Dawn* aircraft. Soper ¶5.  The Design Authority must have access to certain analysis and data underlying an aircraft design (including the Disputed IP that Boeing is attempting to claw back here) in order to validate the structural performance and safety of the aircraft and obtain regulatory approvals. *Id*. Indeed, the Master Agreement establishes that "[t]he following artifacts are among those expected to be produced and delivered in accordance with Task Orders to be issued under this Master Agreement: . . . Analysis and test reports necessary to obtain airworthiness and licensing approvals as Design Authority." D.I. 5-3 at 43 (emphasis added).  The concept of Design Authority and its attendant responsibilities are well understood in the aerospace industry.  Soper ¶6.

### B.    Intellectual Property Provisions of The Master Agreement

To ensure the portability of the aircraft design and Virgin Galactic's ability to act as the Design Authority, the Master Agreement includes provisions granting Virgin Galactic rights to the IP developed during the course of the agreement and to any pre-existing IP upon which the design deliverables are based or that is necessary for Virgin Galactic to be able to use the design deliverables.  Morris ¶18.  For example, Section 7 of the Master Agreement specifies that "VG shall own all rights, title and interest in and to Foreground Intellectual Property."  D.I. 5-3 at 13

(§7(B)).  "Foreground Intellectual Property" is defined as "Intellectual Property first developed, conceived, or generated" by Boeing (or third parties) resulting from its "performance and funded by VG under this Agreement, and any derivative works thereof."  *Id*. at 39.  Furthermore, "Foreground Intellectual Property shall include works of authorship created by" Boeing or its affiliates "in the course of performing under this Agreement." *Id*.

To prevent Boeing from trying to meet design deliverables by using pre-existing IP that Virgin Galactic would not be able to use if it contracted with another supplier, the Master Agreement requires Boeing to identify any "Background Intellectual Property" incorporated in or necessary to use a design deliverable and to grant Virgin Galactic a category 1 or category 2 license to that IP.  *Id*. at 13 (§7(C.1)).  The Master Agreement defines "Background Intellectual Property" as "Intellectual Property, and any derivative works thereof, other than Foreground Intellectual Property"  *Id*. at 37.  It further defines "[Aurora] Background IP" as "any Background Intellectual Property owned by either [Aurora] or one of its Affiliates that is either incorporated into a Deliverable or that is necessary for VG to exploit its rights in the Foreground Intellectual Property."  *Id*.  A category 1 license gives Virgin Galactic "a worldwide, non-exclusive, perpetual, fully paid, irrevocable, sublicensable, and transferable license to use, sell, offer for sale, distribute, import, export, copy, adapt, embed, modify, make derivative works, make and have made the listed Background Intellectual Property for purposes of exploiting Virgin Galactic's rights in the Deliverables and the Foreground Intellectual Property…" *Id*.  A category 2 license grants the same rights except they are not sublicensable or transferrable.  *Id*.

### C.   Boeing's Failed Performance Under the Master Agreement

Boeing began executing Task Order 1 under the Master Agreement in July 2022. Lamboglia ¶5.  By early 2023, Virgin Galactic became aware that Boeing was far behind in completing the preliminary design review (PDR). Ex. 5, Declaration of Steve Justice ¶7.  Boeing

ultimately delivered only 348 of the approximately 580 design items promised under Task Order 1. Ex. 6, Declaration of Aaron Futch ¶14; Morris ¶14.  Virgin Galactic and Boeing embarked on a new Task Order 2.1 in February 2023 so that Boeing could remediate the missing and inadequate PDR deliverables and to replan the project baseline.  Justice ¶8; Lamboglia ¶10. Boeing began performing work under the new Task Order, and on March 8, 2023, it delivered to Virgin Galactic a document referred to as the "262 Document" (one of the documents Boeing is now demanding back).  D.I. 5-11 at 3.  But within weeks, it was clear the time and materials arrangement was not working and that Boeing was billing Virgin Galactic for work that could never lead to a viable design, supported by the required analysis, on anything close to the cost and schedule Boeing had originally proposed.  *Id.*  Virgin Galactic ended up receiving only 15 of the expected 31 deliverables due under Task Order 2.1.  Futch ¶15.

Having paid Boeing over $45 million already, Virgin Galactic refused to pay for additional substandard work product, and on May 18, 2023, Virgin Galactic notified Boeing that Task Order 2.1 would terminate on May 19, 2023 and requested that Boeing upload all deliverables and artifacts under Task Orders 1 and 2.1, regardless of their state of completion, to Virgin Galactic's SharePoint site.  Morris ¶20.  Boeing began uploading deliverables and supporting artifacts, including two documents called "Flight Physics/Math Model Development/Math Model Plan RevA.pptx" and "Flight Physics/Math Model Development/Math Model Plan RevA1.pptx."  D.I. Nos. 5-6, 5-7, 5-8 at 3  (collectively, "the Math Models"); Morris ¶21; Lamboglia ¶¶16-17.

Thus by May 18, 2023, Boeing knew that Virgin Galactic was ending the relationship. With that knowledge, on May 19, 2023, Boeing sent a letter to Virgin Galactic alleging the 262 Document was Boeing proprietary information and demanding its destruction.  D.I. 5-11 at 2.

On June 16, 2023, Boeing sent a second letter to Virgin Galactic alleging that the Math Models had been uploaded inadvertently and demanding their destruction or return. D.I. 5-8 at 3. The 262 Document and the Math Models are the intellectual property that is the subject of the present motion and are discussed below.

### D.    The 262 Document

The 262 Document is dated January 27, 2023, and includes the legend "Virgin Galactic: Dawn" as well as an image of the *Dawn* Aircraft on its cover. It was delivered to Virgin Galactic on March 8, 2023 for Virgin Galactic's benefit in the course of the Master Agreement. D.I. 5-10, 5-9; Lamboglia ¶11. It contains material qualification data for a carbon composite material known as IM7/8552 that Aurora selected for a number of structural members and aerodynamic surfaces of the *Dawn* aircraft. Justice ¶9. This data is required for Virgin Galactic to use the preliminary design that Boeing delivered. *Id.*

Boeing selected the IM7/8552 material for *Dawn*'s preliminary airframe design, which includes design of the fuselage, the wing, the nacelle, and the launch pylon, among several other sub-assemblies. Justice ¶10; Lamboglia ¶11. The Task Order 1 wing design package, for example, includes stress analysis deliverables showing that the wing will perform properly under anticipated loads and not fail. Justice ¶¶10-11. To meet this deliverable, Boeing selected composite material IM7/8552 for several components of the wing design and delivered finite element model (FEM) stress analysis for those components, based on that material. Justice ¶11. Those analyses made use of the material qualification data contained in the 262 Document. Justice ¶12; Morris ¶18. Virgin Galactic requires the data in the 262 Document in order to replicate and validate Boeing's preliminary design analysis of the wing components (and other subsystem components designed using this material). Justice ¶12. Virgin Galactic's structural integrity team, for example, is unable to sign off on the stress analysis of the preliminary design

without the statistical test data in the 262 Document describing the mechanical properties of the IM7/8552 material and how that statistical data was derived. *Id*. ¶¶12-13

As Design Authority for the *Dawn* aircraft, Virgin Galactic is liable for all aspects of its operation and responsible for obtaining certification by the FAA, for example, that its aircraft will meet the safety standards that Virgin Galactic has set.  Without the 262 Document, Virgin Galactic cannot perform these functions.  *Id*. ¶13.   Boeing's preliminary design of the components made from IM7/8552 is useless and unusable by Virgin Galactic without access to the 262 Document. *Id*. ¶13.  Indeed, ensuring access to supporting data and analysis such as that in the 262 Document is what drove negotiation of the intellectual property provisions of the Master Agreement.  Morris ¶18.

E.     **The Math Models**

The Math Model documents are each dated April 2023 and include a cover page with an image of Virgin Galactic's *Dawn* Mothership.  D.I. 5-6, 5-7.  The documents include multiple pages of *Dawn* specifications and requirements, as well as several slides presenting "equations of motion."  *Id*.; Justice ¶15.  There are changes to the "equations of motion" between the Rev A document and the Rev A1 document that indicate that Boeing was revising the equations and/or parameters of the equations specifically for the *Dawn* project, compare, *e.g.,* D.I. 5-6 at 14 and D.I. 5-7 at 15; Justice ¶15, further demonstrating that the Math Models were prepared for Virgin Galactic's benefit under the contract.  Although the Exhibits at D.I. 5-6 and 5-7 submitted by Boeing now include a "Boeing Proprietary" legend on certain pages**, those legends were not present in the Math Models as delivered to Virgin Galactic, and Boeing admits it altered those documents for this litigation to add the legends.**  D.I. 5-2 at ¶31; *see also*  D.I. 5-8 at 3 ("The original documents were provided to you without proper marking").

The equations of motion in the Math Models are necessary for flight dynamics analysis and for validating the PDR analyses that Boeing delivered.  Justice ¶16.  Specifically, as part of the preliminary design, Boeing modified the external contours of the *Dawn* Mothership to reduce drag for increased mission performance. *Id*. While Boeing delivered the results of this analysis, Virgin Galactic requires the models and underlying equations to independently validate the results and as technical substantiation of performance for regulatory compliance. *Id*.  Again, ensuring access to the type of supporting data and underlying analysis, such as the equations in the Math Models, is what drove negotiation of the intellectual property provisions of the Master Agreement.  Morris ¶18.

The Math Models are also required to substantiate Flight Physics analyses deliverable as part of the PDR design package under Task Order 1. Justice ¶17.  Such deliverables include modeling the aerodynamics, stability, and control of the aircraft, loads and dynamics, mass properties, and the aircraft performance characteristics.  *Id*.; Morris ¶21; D.I. 5-4 at 9-10. These Flight Physics analyses must be validated by Virgin Galactic in its capacity as Design Authority, and they cannot be validated without visibility into the equations of motion underlying the Math Models.  Morris ¶22; Justice ¶19.

Boeing alleges the Math Models merely reflect internal discussions about a proposal to deliver Math Models to Virgin Galactic as a "black box" whereby Virgin Galactic would not have access to the underlying equations themselves. D.I. 5-2 at ¶30.  Virgin Galactic never agreed to any "black box" proposal.  Morris ¶22.  Nor do the Math Model documents include any indication that the equations will not be provided.  D.I. 5-6, 5-7.  It would not be possible to gain regulatory approval of an aircraft if its Flight Physics analysis were based on equations of motion that were not disclosed.  Morris ¶22; Lamboglia ¶18.

### F.     Disposition of the 262 Document and the Math Models

Despite owning these documents under the contract, after Boeing demanded their return or destruction in May and June of 2023, Virgin Galactic, in good faith, made no use of the Math Models or the 262 Document and has not shared them with any third parties aside from its legal counsel (even though Boeing never demanded or even asked that it do so), hoping to resolve the dispute over Virgin Galactic's rights. Futch ¶¶ 23-24.  When it became apparent to Virgin Galactic in early 2024 that any resolution was going to involve drawn-out negotiations, Virgin Galactic deleted all copies of the documents, and even any email referencing them, except for one copy sequestered in a locked folder maintained by Virgin Galactic's legal department, and for the first time informed Boeing of the sequestration.  *Id*.  Since receiving the documents, Virgin Galactic has not used them or disclosed them to any third party, despite having the right to do so under the contract.  Futch ¶24; Justice  ¶21; Morris ¶24; Soper ¶22; Lamboglia ¶¶21-22.

## III.    LEGAL STANDARD

There are three legal issues here: (1) the standard for a preliminary injunction, (2) the standard for prevailing under the Defend Trade Secrets Act and the similar Delaware Uniform Trade Secrets Act, and (3) the standard for prevailing in a breach of contract dispute under Delaware law. Each is summarized below.

A preliminary injunction is an "extraordinary remed[y] involving the exercise of [a] very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).  No preliminary injunction can issue unless the moving party demonstrates (1) that he (or she) is likely to succeed on the merits; (2) that he (or she) is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his (or her) favor, and (4) that an injunction is in the public interest. *Winter v. NDRC, Inc.*, 555 U.S. 7, 20 (2008).  The Fourth Circuit requires that "each of these

[*Winter*] factors be satisfied as articulated," and that "courts considering whether to impose [a preliminary injunction] must separately consider each *Winter* factor." *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013) (internal citation omitted).

To prove a violation of the Defend Trade Secrets Act ("DTSA"), a plaintiff must show that "(1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce." *Space Sys./Loral, LLC v. Orbital ATK, Inc*., 306 F. Supp. 3d 845, 853 (E.D. Va. 2018) (citing 18 U.S.C. § 1836(b)(1)). The requirements under the Delaware Uniform Trade Secrets Act ("Del. UTSA") generally mirror the DTSA. *See, e.g., Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *3 (Del. Super. Ct. 2001). (expressing the requirements of the Del. UTSA as: "(1) Does a trade secret exist, i.e., have the statutory elements-commercial utility arising from secrecy and reasonable steps to maintain secrecy been shown; (2) Has the secret been communicated by plaintiff to the defendant; (3) Was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) Has the secret information been improperly (e.g. in breach of the understanding) used or disclosed by the defendant to the injury of the plaintiff?").

To prove breach of contract under Delaware law, plaintiffs must show (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) the resultant damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003).

## IV.   ARGUMENT

Boeing cannot satisfy any of the required *Winter* factors. First, Boeing cannot show a likelihood of success on the merits because the 262 Document and Math Models are duly owned or licensed by Virgin Galactic under the Master Agreement. Second, Boeing faces no risk of irreparable harm at least because Virgin Galactic has not used or disclosed the Math Models or

the 262 Document and does not compete with Boeing in the space tourism business. Third, balancing of equities favors Virgin Galactic because it cannot use significant portions of the preliminary design delivered by Boeing, and for which it paid Boeing over $45 million, without the 262 Document and the Math Models. Meanwhile Boeing suffers no harm while Virgin Galactic does not disclose the documents to third parties. Fourth, there is no public interest in allowing Boeing to claw back IP that was contractually transferred to Virgin Galactic. To the contrary, it is in the public interest to require companies to adhere to such contractual terms.

**A.    Boeing Is Not Likely To Succeed on the Merits**

**1.    Boeing Is Not Likely To Prevail on its Trade Secret Claims.**

Boeing is not likely to succeed on the merits because Virgin Galactic owns or has a valid license to the 262 Document and Math Models. In the context of a preliminary injunction motion when a trade secret claim is "predicated on" complex contractual interpretation, the plaintiff cannot demonstrate a likelihood of success on the merits absent a clear showing that its contractual interpretation is correct. *Salient CRGT, Inc. v. Sols. by Design II, LLC*, 2020 WL 3550008, at *5-7 (E.D. Va.. 2020) (concluding that "whether something amounts to a trade secret, and whether a trade secret has been misappropriated, are both questions of fact and that this case involves a complex contractual dispute and, at this stage, a clear victor is not apparent. Accordingly, [Plaintiff] has not demonstrated that it is likely to succeed on its claims for misappropriation of trade secrets." (internal citations omitted)). Boeing cannot make this showing—at least not at this stage of the case.

Just as in *Salient CRGT*, Plaintiffs' trade secrets claim here is predicated on whether Virgin Galactic has a valid ownership interest in the Disputed IP—if Virgin Galactic owns or has a license in the Disputed IP, Boeing's misappropriation claim necessarily fails. Boeing acknowledges as much in the motion: "[t]o prove misappropriation of trade secrets under the

DTSA, Boeing and Aurora must show that they own trade secrets." D.I. 5-2, 18.  Determining whether Virgin Galactic has such an ownership interest depends on interpretation of contractual terms defining Foreground Intellectual Property, Background Intellectual Property, investigation of the circumstances of the creation and delivery of the Disputed IP, and examination of the contents of the Disputed IP in the context of an aerospace design and development project and general practices in the industry.  Boeing has not shown that it is the "clear victor" of this contractual dispute—in fact, its claim will likely fail, because Boeing transferred ownership, or at least a license, to Virgin Galactic under the Master Agreement.  As such, Boeing cannot show it is likely to succeed on its claims for misappropriation of trade secrets.

### i.      The 262 Document and the Math Models are owned by or licensed to Virgin Galactic.

#### (1)      The 262 Document

Who is entitled to the 262 Document is governed by the Master Agreement's "Foreground Intellectual Property" and "Background Intellectual Property" clauses.  The Master Agreement defines Foreground Intellectual Property to mean IP "first developed, conceived, or generated by a Party or by a third party for the benefit of a Party under this Agreement, resulting from [Aurora's] performance and funded by Virgin Galactic under this Agreement, and any derivative works thereof."  D.I. 5-3, 39.  Foreground Intellectual Property also "include[s] works of authorship created by [Aurora], Affiliates of [Aurora], Subcontractors of [Aurora], or any employees of any of them in the course of performing under this Agreement."  *Id*.  The 262 Document easily falls within this category.

The 262 Document was first developed or generated for Virgin Galactic's benefit under the Master Agreement.  The 262 Document, as delivered to Virgin Galactic, did not exist before the parties began working together.  The 262 Document bears the title "Virgin Galactic: Dawn"

and includes an image of the Virgin Galactic Mothership.  Boeing created the 262 Document in furtherance of Virgin Galactic's interest under the agreement.  And as materials allowables data, the document falls clearly under the scope of Task Orders 1 and 2.1, for which Virgin Galactic has already paid millions.  Justice ¶¶10-13.

Circumstances surrounding the delivery of the 262 Document also indicate that it was generated for Virgin Galactic's benefit.  Boeing delivered the 262 Document to Virgin Galactic in response to Virgin Galactic's requests for information that would support a materials analysis related to the Airframe PDR.  D.I. 5-9; Justice ¶9.  Indeed, when Boeing sent Virgin Galactic the 262 Document, Boeing acknowledged that it was being sent "***in furtherance of [Aurora]'s performance of Task Order 1 and Task Order 2.1.***"  D.I. 5-9, 2 (emphasis added).  Although the letter also alleges that the document is not Foreground or Background Intellectual Property, Boeing's boilerplate statements do not make that true— the nature of the document itself makes it Foreground IP by operation of the Master Agreement, which does not recognize any right that Boeing can simply unilaterally proclaim the status of delivered IP.  Soper ¶11.

To the extent Boeing argues that data *compiled into* the 262 Document was pre-existing, and thus not Foreground IP, the data is at least "Background Intellectual Property" under the Master Agreement, and Virgin Galactic therefore has a license to it.  The Master Agreement defines "Background Intellectual Property" to mean "Intellectual Property and any derivative works thereof, other than Foreground Intellectual Property.  D.I. 5-3, 37.  The contract further defines "[Aurora] Background IP" to mean "any Background Intellectual Property owned by either [Aurora] or one of its Affiliates that is either incorporated into a Deliverable or that is necessary for Virgin Galactic to exploit its rights in the Foreground Intellectual Property."  *Id*.

The 262 Document is both incorporated into Boeing's preliminary design review (PDR) deliverables and is needed for Virgin Galactic to exploit its rights in Foreground IP.

The 262 Document is woven into Boeing's PDR deliverables and is necessary to exploit Foreground IP. The 262 Document contains qualification test data regarding a composite material known as IM7/8552 and provides support for the "allowables" that specify, for example, the tensile strength of the material when formed with a certain geometry and with certain sizes. Boeing selected the IM7/8552 material for its preliminary design of *Dawn*, including for the Foreground IP representing the preliminary airframe design, which includes the fuselage, the wing, the nacelle, and the launch pylon, among other assemblies. Justice ¶10; Lamboglia ¶11. By selecting IM7/8552 for its preliminary design, Boeing made the data in the 262 Document necessary to exploit the Foreground IP because Virgin Galactic cannot validate the preliminary airframe design (among other component designs based on that material) without access to the qualification test data. Boeing's assertion that "Virgin Galactic does not need to know how Boeing and Aurora know IM7/8552 will perform in particular ways or see the data supporting that knowledge" (D.I. 5-1, 15) is incorrect. Virgin Galactic has Design Authority on the *Dawn* Project; Boeing does not. As the Design Authority, Virgin Galactic bears legal liability related to *Dawn*'s design and is solely responsible for the certification, licensing, and operation of the aircraft. Virgin Galactic is required to answer to regulators, like the FAA, and be able to explain how the aircraft adheres to Virgin Galactic's stated safety metrics. Soper ¶¶5-6, 13-15. If asked, Virgin Galactic must be able to "show its work" to the FAA and explain why its structural analysis is correct and reliable. *Id*. Additionally, in the unlikely event of an accident or failure, Virgin Galactic would need to respond to investigators and be able to provide data supporting *Dawn*'s safety, performance, and other compliance analyses. *Id*.

Boeing's structural design deliverables in Task Order 1 rely upon the IM7/8552 material properties data in the 262 Document. For example, the Finite Element Model (FEM) stress analysis is part of the Airframe PDR deliverable and use of the IM7/8552 material and information from the 262 Document. Justice ¶¶10-11, Ex. 1 (presenting FEM analysis of the wing components made from IM7/8552 composite). Without access to the data in the 262 Document, Virgin Galactic is unable to validate Boeing's analysis in the FEM and the preliminary airframe design is not usable. Justice ¶¶9, 12; Morris ¶19.

Boeing incorrectly argues that other documents it licensed to Virgin Galactic—a sizing allowables table (AR21-023) and a process specification—are sufficient to enable Virgin Galactic to use the PDR design. D.I. 5-1, 14-15; D.I. 5-2 ¶40. But those documents simply teach, as a hypothetical example, constructing a panel having a 1/8" thickness that is specified to support a load of 10 kg. But those documents include no information to show how Virgin Galactic would be able to prove such a panel would indeed have the specified strength. Morris ¶¶17-19. Virgin Galactic cannot move forward with a design that it cannot validate and for which it cannot get regulatory approval.

(2)    <strong>The Math Models</strong>

The Math Models are also Foreground IP because they were first developed or generated under the Master Agreement. The Math Models are Power Point presentations dated April 2023 with a cover page depicting the *Dawn* aircraft. D.I. 5-6, 5-7. They include multiple slides with Virgin Galactic logos, project images, and statements about the specifications and requirements of the *Dawn* project as well as slides entitled "equations of motion." *Id*. There are also differences between the equations of motion in the RevA and RevA1 versions of the Math Models that indicate that Boeing was revising the equations and/or parameters of the equations specifically for Virgin Galactic's project. Justice ¶15. Moreover, according to Boeing's letter to

Morris the Math Model presentations were made in response to discussions about Boeing's performance under the Master Agreement.  *See* D.I. 5-8 at 3-4.  The circumstances surrounding the delivery of the Math Models also indicate that they are Foreground IP: the Math Models were delivered in response to specific requests from Virgin Galactic for PDR artifacts and other Foreground IP developed while Boeing and Virgin Galactic still had an active contract.  Morris ¶20; Lamboglia ¶19; Futch ¶18; Soper ¶21..  There are no markings or legends anywhere in the Math Models to suggest they are Boeing proprietary or were not intended to be a deliverable under the Master Agreement.[2]  Boeing's argument that they were inadvertently disclosed is utterly inconsistent with their appearance and markings indicating that they were prepared for delivery to Virgin Galactic, implying that this argument was manufactured by Boeing in order to leverage Virgin Galactic into paying Boeing more money.

To the extent Boeing argues that the equations of motion within the presentations were pre-existing and not created under the Master Agreement, that argument is belied by the fact that the equations changed between Rev A and Rev A1 of the Math Model presentations.  Compare, *e.g.,* D.I. 5-6 at 14 with D.I. 5-7 at 15.  But even if that argument had merit, the Math Models are at a minimum Background IP, in which Virgin Galactic has a license.  The Math Models are necessary for Virgin Galactic to exploit its rights in Foreground IP delivered under Task Orders 1 and 2.1.  Morris ¶¶21-22; Soper ¶¶20-21.  The Math Models were provided under "Flight Physics/Math Model Development/"  D.I. 5-6, 5-7.  Section 1.3.2 of Task Order 1 describes the "Flight Physics" deliverables due for PDR, including Flight Physics performance analysis, Flight Physics Loads & Dynamics, and Flight Physics Mass Properties, among others.  D.I. 5-4 at 9-10;

---

2 As noted above, Boeing altered the Math Models it attached as exhibits in this case (D.I. 5-6, 5-7) to add a "Boeing Proprietary" legend in several places.  However, that language did not appear in the Math Models delivered to Virgin Galactic.  *See* D.I. 5-2 ¶31.

Morris ¶21.  By Boeing's own description, the Math Models contain "equations . . . relevant to an aircraft's **aerodynamic properties**" and "formulations, parameters, and variables that tell engineers that certain factors are particularly relevant to **aircraft stability** and operability."  D.I. 5-1 at 7 (emphasis added).  Section 1.3.2.1.1 of Task Order 1 lists "analysis of the Aircraft performance (**including aerodynamics, stability** and control, and propulsion performance analysis)" as a deliverable.  D.I. 5-4 at 10 (emphasis added).

Virgin Galactic certainly understood the Math Models to be artifacts supporting Boeing's Flight Physics analysis PDR deliverables.  Morris ¶21; Lamboglia ¶¶16-17.  Virgin Galactic is unable to validate the Flight Physics analysis without visibility into the equations of motion used to create those analyses.  Morris ¶22; Justice ¶¶18-19.  Furthermore, as the Design Authority of the *Dawn* Mothership, Virgin Galactic is answerable to the FAA and must be able to explain why its aerodynamics analysis demonstrates compliance with the requirements set for safety and performance.  *Id*.  Virgin Galactic did not, and never would have, accepted the Math Models as a "black box" because of Virgin Galactic's responsibility as the Design Authority.  *Id*.; Lamboglia ¶18.  At least because the Math Models are necessary for Virgin Galactic to exploit the PDR design Flight Physics deliverables, they are at minimum Background IP licensed to Virgin Galactic under the terms of the Master Agreement.

### ii.     Boeing did not take reasonable measures to protect the alleged confidentiality of the Math Models from Virgin Galactic.

No trade secret exists to misappropriate unless the claimed owner takes reasonable steps to maintain its secrecy.  *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *3 (Del. Super. Ct. 2001) (explaining requirements of Del. UTSA).  "[T]rade secrets also do not survive when the alleged owner fails to take reasonable precautions to keep the information secret." *Young Design, Inc. v. Teletronics Int'l, Inc.*, 2001 WL 35804500, at *6 (E.D. Va. July 31, 2001) (citing

*Advanced Comput. Servs., Inc. v. MAI Sys. Corp.*, 845 F. Supp. 356, 370 (E.D.Va.1994)).  Such a determination is a "'fact intensive' question."  *Id.*[3]

Boeing cannot succeed on its claim that the Math Models are its trade secret because it cannot establish that it employed reasonable measures to protect their secrecy from Virgin Galactic.  The circumstances surrounding Boeing's preparation, handling, and delivery of the Math Models do not comport with industry standards for intellectual property protection.  According to Boeing, the Math Models were Boeing internal documents intended for internal discussion only that were inadvertently delivered to Virgin Galactic.  D.I. 5-2 ¶¶30-31.  If this explanation were correct, Boeing took no precautions when it put allegedly confidential equations into Power Point presentations styled to look like *Dawn* deliverables, complete with *Dawn* cover pages and multiple pages of *Dawn* specifications and requirements, and included no legends indicating that any portion of the presentations were confidential.  Lamboglia ¶19;  D.I. 5-6, 5-7; *see also* D.I. 5-2 at 31.

Further, if the delivery of the Math Models to Virgin Galactic truly was inadvertent, such delivery occurred precisely because Boeing was not practicing industry standards for protecting proprietary intellectual property.  Boeing evidently took no reasonable steps, such as classifying the Math Models as sharable with outside parties or not, adding logos and legends to indicate confidentiality, and it evidently did not sequester the Math Models from other *Dawn* materials it was preparing for delivery since Boeing simply uploaded them, with other deliverables, to Virgin Galactic's SharePoint site on two separate occasions.  Lamboglia  ¶¶19-20.  If Boeing believed

---

[3] While *Young Design Inc. v. Teletronics Int'l, Inc*. involves a Virginia Uniform Trade Secrets Act (VUTSA) claim, the Eastern District of Virginia has recognized that "in critical respects, the applicable standards under the DTSA and under state-law analogues—for instance, the VUTSA—are nearly identical."  *OROS, Inc. v. Dajani*, 2019 WL 2361047, at *2 (E.D. Va. 2019).

that the Math Models were proprietary and not suitable for Virgin Galactic to view, its conduct is inconsistent with industry practice.  *Id*.  While Boeing states that it "marks the equations as proprietary, stores them on secure servers and systems,  . . . limits access[,]" and does not disclose except through a formal process" (D.I. 5-1 at 20), none of those precautions were actually taken here.  Boeing included the equations in Power Point Presentations prepared for Virgin Galactic and delivered them with no proprietary markings after being asked to deliver PDR artifacts in order to satisfy Boeing's obligations under the Master Agreement.  Lamboglia ¶19.

Boeing's communications with Virgin Galactic also demonstrate that Boeing did not treat the materials as its trade secrets.  In a May 19, 2023 email, Boeing asked Virgin Galactic to destroy "documents and other media provided by members of the Aurora team . . . inadvertently disclosing Proprietary information" but Boeing did not know if any such material actually existed.  D.I. 5-11, at 2.  Boeing's contract manager explained that the "open dialogue" between Boeing and Virgin Galactic's teams "h[as] heightened the exposure that someone may disclose something they should not."  *Id*.  He further explained:

> Frankly, having a hundred engineers on both sides talking, e-mailing, and exchanging files with one another on a daily basis for more than a year creates the possibility someone . . . disclosed something containing Proprietary Information without authorization.  Aurora is requesting that if Virgin Galactic find something you did not receive as a Deliverable, you thoughtfully consider how Virgin Galactic came into possession.  If it is marked Proprietary or contains information you would reasonably regard as proprietary, ***and it was not provided as part of a Deliverable***, you likely did not receive it through proper channels."

*Id*. (emphasis added).

There are several key takeaways from this message: (1) Boeing admitted that even its claimed IP protocols were not followed throughout the *Dawn* project; (2) Boeing was not actively tracking the transmissions of its Proprietary Information and did not know if such

information had been sent to Virgin Galactic; (3) Boeing acknowledged that even materials marked as Boeing's proprietary information were properly in Virgin Galactic's possession if provided as part of a deliverable; and (4) Boeing attempted to task ***Virgin Galactic*** with the identification and protection of Boeing's Proprietary information.  None of this behavior comports with industry standards for protecting confidential trade secrets from Virgin Galactic, suggesting that Boeing either did not view the Math Models as trade secrets or that their disclosure was not inadvertent because Boeing actually intended them to be deliverables under the contract. *See* Lamboglia ¶¶19-20.

### iii.     Virgin Galactic did not misappropriate the alleged trade secrets.

Virgin Galactic did not misappropriate the alleged trade secrets, and Boeing cannot, therefore, succeed on the merits of its misappropriation claims.  Virgin Galactic rightfully received the disputed materials under the Master Agreement, and as such, was not under any obligation to return or destroy the materials.  The DTSA and the Del. UTSA recognize misappropriation as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5)(B)(ii)(II); *accord* 6 Del. C.§ 2001(2)(b)(2)(B).  Virgin Galactic's actions do not comport with this description.  This is not a typical trade secret case, where an employee takes information from a former employer or where an entity acquires information through illicit means.  Boeing granted Virgin Galactic ownership or a license to the Disputed IP by operation of the Master Agreement.

As discussed above, the 262 Document and Math Models are either Foreground IP or Background IP under the Master Agreement, either of which permits Virgin Galactic to possess and use the Disputed IP in its Mothership Program.  Under the Master Agreement, "VG shall own all rights, title and interest in and to Foreground Intellectual Property."  Dkt 5-3, 13.  Where intellectual property constitutes Aurora Background IP, "[Aurora] will grant . . . licenses to VG" which licenses Virgin Galactic to "use," "import, export, copy, adapt, embed, modify, make derivative works" of the "Background Intellectual Property for purposes of exploiting VG's rights in the Deliverables and the Foreground Intellectual Property, such license for use with VG's mothership carrier aircraft development and operation."  *Id*.  Both parties understood that under the Master Agreement, Virgin Galactic has the right to end the program after any Task Order and retains the right to use the delivered design without Aurora or Boeing's involvement.  Soper ¶10.  Because the Disputed IP constitutes either Foreground or Background IP, Boeing's misappropriation arguments necessarily fail because Virgin Galactic has a right to utilize the IP.

Boeing's argument that Virgin Galactic "asserted ownership" of the Disputed IP after it was purportedly acquired by Virgin Galactic "by accident or mistake," D.I. 5-1 at 18, 25 (citing 18 U.S.C.§ 1839(5)(B)(iii)(II)), does not demonstrate a likelihood of success on the merits.  Regardless of whether Boeing distributed the Math Models by mistake, under this part of the DTSA, Boeing must demonstrate that Virgin Galactic had a material change of position after acquisition ("the term 'misappropriation' means—(B) disclosure or use . . . by a person who . . . (iii) ***before a material change of the position of the person***, knew or had reason to know that . . . the trade secret had been acquired by accident or mistake") (emphasis added).  Boeing has failed to identify any change in Virgin Galactic's position, much less one that was material.  *See* D.I. 5-1.  Virgin Galactic has ***always*** taken the position that it is the owner or licensee of the Disputed

IP.  Futch ¶21.  If anything, it is Boeing that has changed its position when it claimed—only *after* delivering the Math Models to Virgin Galactic as required under the Master Agreement— that those documents were not owned by Virgin Galactic. The only case law Boeing cites on this point, *Myers v. Williams*, 819 F. Supp. 919, 921 (D. Or. 1993), does not even address whether the defendant had a material change of position.

### 2.   Boeing Has Not Demonstrated a Likelihood of Success On Its Breach of Contract Claim.

Under Delaware law, in order to prove breach of contract, Boeing must demonstrate (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff.  *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003).  Virgin Galactic does not dispute that the parties had a contract.  However, Boeing has not demonstrated either a breach or resultant damage to itself.

### i.   Virgin Galactic did not breach the Master Agreement

As discussed at length above, Virgin Galactic has a valid ownership interest in the 262 Document and in the Math Models.  Boeing's argument for breach of contract rests on its argument that the Disputed IP is not Foreground or Background IP under the Master Agreement. *See* D.I. 5-1, 24-25.  Boeing argues that it has the obligation to identify Background IP under the contract and never did so with respect to the Disputed IP.  But failing to identify the Disputed IP as Background IP does not excuse Boeing from its obligations.  Once Boeing chose to rely on the data in the 262 Document and in the Math Models to create deliverables for Virgin Galactic, that underlying data became owned by or licensed to Virgin Galactic as part of the delivered design. The Master Agreement provides that where there is "[a]ny disagreement between the Parties as to the categorization of Background Intellectual Property shall be resolved by mutual agreement"; if parties are "unable to reach agreement as to the categorization" Aurora is to

provide Foreground Intellectual Property in lieu of the disputed Background Intellectual Property accordance with Paragraph C of Article 23 (Changes)." Dkt 5-1, 24; 5-3, 33. Thus, if Boeing disputed whether the 262 Document or Math Models were Background IP supporting its preliminary design, it was obligated to provide Foreground IP instead, but it did not. Because the Disputed IP was provided to Virgin Galactic either as Foreground IP or Background IP, Virgin Galactic's possession of such IP cannot constitute breach of the Master Agreement.

> ii. **Boeing has not been harmed by Virgin Galactic's possession of the Math Models and 262 Document.**

Boeing has not demonstrated that Virgin Galactic's possession of the Math Models and 262 Document has resulted in harm to Boeing. Virgin Galactic has not used or disclosed the documents to any third parties. Morris ¶24. In addition, Boeing's damages arguments are speculative. Boeing's sole cited case is *Cap. One Fin. Corp. v. Sykes*, 2021 WL 2903241 (E.D. Va. July 9, 2021), which is inapplicable here. In *Capital One*, the court found harm because plaintiff and defendant were competing against each other to be selected for the same contract in a niche market. Here, plaintiffs and defendant are not competing against each other, so the reasoning of *Capital One* does not apply. Boeing's argument that "Virgin Galactic's use or disclosure of" the 262 Document and Math Models "would give it a competitive advantage in the future development of its Mothership." (Dkt 5-1, 31, internal citation omitted) is nonsensical. Virgin Galactic is not competing against Boeing for a contract. Virgin Galactic is entitled to use the Foreground and Background IP delivered to it under the Master Agreement to continue its Mothership Program without Boeing's involvement. Morris ¶10. Because Boeing has not demonstrated resultant damage to itself, and has in fact been paid in excess of $45 million, it has not demonstrated the required harm.

Because Boeing cannot establish a reasonable likelihood of success on the merits under either a trade secrets or breach of contract theory, its motion for preliminary injunction must fail.

### B.      Boeing Cannot Show Irreparable Harm.

A preliminary injunction cannot issue unless Boeing can show that it will suffer irreparable harm. To satisfy this requirement, Boeing must show more than a future risk of irreparable harm; instead, it must make a "clear showing" of irreparable harm that is neither "remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and citation omitted). It must also be "likely" that the asserted harm will occur if no injunction is issued. *Aslanturk v. Hott*, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 974 (D. Minn. 2018).

Boeing tries to shortcut this element, arguing that "Courts in this district [] presume that likelihood of success on the merits of statutory trade secrets claims demonstrates irreparable harm sufficient to support a preliminary injunction," citing *Hampton Rds. Connector Partners v. Land to Sand Site Servs., Inc*., 2023 WL 8539536 (E.D. Va. Oct 17, 2023). D.I. 5-1 at 26-27. While some cases may suggest such a presumption, the Fourth Circuit has explained that traditional tests balancing between likelihood of success and irreparable harm were supplanted by the Supreme Court's decision in *Winter*: "In *Winter*, however, the Supreme Court clarified that each preliminary injunction factor – likelihood of success, irreparable harm, the balance of equities, and the public interest – must be 'satisfied as articulated.'" *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th Cir. 2023) (citing *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010)). Courts in this Circuit properly following *Winter* separately analyze whether a risk of irreparable harm exists,

even when likelihood of prevailing on misappropriation of trade secrets has been established. *E.g., Cap. One Fin. Corp. v. Sykes,* 2021 WL 2903241, at *13–14 (E.D. Va. July 9, 2021) (analyzing risk of irreparable harm after already determining Capital One likely misappropriated trade secrets); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*., 2022 WL 326473, at *8 (D. Md. Feb. 3, 2022) (analyzing irreparable harm after being satisfied plaintiff was likely "to prevail on at least one of its claims for misappropriation of trade secrets").[4]

The other cases Boeing relies upon are distinguishable, as none involves materials obtained contractually that have been sequestered and not used or shared.  *See SDSE Networks, Inc. v. Mathur*, 2022 WL 18109791, at *2 (E.D. Va. Sept. 15, 2022) (ex-employee concealing a new job with a competitor and stealing trade secrets); *CACI, Inc. Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 2023 WL 3570439, at *14 (E.D. Va. 2023) (Navy attempting to reverse engineer software taken from plaintiff); *Peraton, Inc. v. Raytheon Co.*, 2017 WL 11501665, at *3 (E.D. Va. Nov. 7, 2017) (party stealing trade secrets to compete for the same project); *Home Funding Grp., LLC v. Myers*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) (departing employee taking trade secrets to compete with former employee). Boeing is unable to allege any immediate or irreparable harm justifying injunctive relief.

### 1.    Boeing Is Not Harmed If Virgin Galactic Develops *Dawn* Without Boeing

Boeing argues that "Boeing and Aurora would be irreparably harmed if its trade secrets are utilized in a way that compromises its ability to provide a unique . . . product like the Mothership."  (D.I. 5-1 at 27.)   Boeing's argument runs counter to the express terms of the

---

[4] Moreover*, Hampton Roads*, in which a party surreptitiously accessed and downloaded documents from a company's servers without authorization, is very different from this case, in which Virgin Galactic is contractually entitled to the Math Models and the 262 Document that were provided to Virgin Galactic by Boeing itself.

Master Agreement and is baseless.  Boeing acknowledges in the Wirsing declaration that the Master Agreement was split into "contractual phases, with each phase governed by individually negotiated and executed Task Orders," and the parties understood that "either party could elect not to agree to the next task order."  D.I. 5-2 at ¶16.  Thus, the parties understood their collaboration could end after any Task Order and that Virgin Galactic had the right to continue the project alone or with another third party.  *See, e.g.,* D.I. 5-3 at Section 18(d)(3) ("[Aurora] will provide transition services to VG as requested to support the transfer of work on the Program from [Aurora] to either VG or a third party."); Morris ¶10.  Further, the starting point for *Dawn* was the unique *Eve* Mothership design, which originated with Virgin Galactic and not Boeing.  Morris ¶13.  And Virgin Galactic and Boeing are not competitors in this business.

The *CACI, Inc. Fed. v. U.S. Navy* case Boeing cites is readily distinguishable.  There, the Navy contracted with CACI to use its aircraft maintenance software for aircraft inspections and then proceeded to reverse engineer the software to create its own competing product. 2023 WL 3570439 at *4-5.  Here, by contrast, Boeing used its IP to deliver a design to Virgin Galactic that Virgin Galactic cannot use without access to that IP, which is precisely the reason that Virgin Galactic negotiated the intellectual property licensing terms of the Master Agreement.  Virgin Galactic is not reverse engineering Boeing's work or seeking to compete with Boeing, but rather, simply using the design Boeing was contracted to deliver.

Moreover, Boeing's assumption that Virgin Galactic cannot meet its projected timeline for a new Mothership without giving the Math Models and the 262 Document to another contractor (D.I. 5-1 at 29) is pure speculation and is simply not correct.  Such speculation, unsupported by any evidence, does not demonstrate an imminent risk of irreparable harm.

### 2. Boeing's Assertion of Irreparable Harm is Contradicted By Its Own Delay in Bringing Suit

Boeing asked for destruction or return of the 262 Document and Math Models on May 19 and June 16, 2023, respectively, nearly ten months before seeking a preliminary injunction. Morris ¶21; Lamboglia ¶¶16-17.  Boeing's lengthy delay shows there is no immediate need for the extraordinary remedy of a preliminary injunction and no immediate harm to Boeing.  An "inordinate delay in initiating a preliminary injunction proceeding ... 'indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction.'"  *See e.g., N. Virginia Hemp & Agric. LLC v. Virginia*, 2023 WL 7130853, at *12 (E.D. Va. Oct. 30, 2023) (finding 6 month delay excessive); *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir.1989) (finding 9 month delay excessive); *Provident Pharm., Inc. v. Amneal Pharms., LLC*, 2008 WL 3843505 at (Aug. 15, 2008 E.D. Virginia ) (finding 11 month delay excessive).[5]

### 3. Virgin Galactic's Sequestration Negates any Imminent Harm

Boeing cannot show actual and imminent harm necessitating a preliminary injunction in this case because Virgin Galactic has sequestered the Disputed IP since January and has not used it or disclosed it to any third parties besides its legal counsel in this case.  Morris ¶24; Futch ¶¶23-24.  As such, Boeing is in no immediate danger of the Disputed IP being disclosed, and there is no risk of irreparable harm here.  *See e.g., Direx Israel*, 952 F.2d at 816 ("[W]here the harm is admittedly not present or immediate but merely problematic, conditioned on possible

---

[5] Other courts are in accord.  *See Cablevision Sys. Corp. v. Verizon New York Inc.,* 119 F. Supp. 3d 39, 52 (E.D.N.Y. 2015) (finding six-month delay unreasonable); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420–21 (E.D.N.C.2006) (finding six-week delay unreasonable); *Baer v. Nat'l Bd. of Med. Exam'r*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (finding three-month delay unreasonable); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) (finding nine-month delay unreasonable); *Cuddle Wit. Inc. v. Chan*, 1989 U.S. Dist. LEXIS 14412, at "2, 14 U.S.P.Q.2d (BNA) 1572, Copyright L. Rep. (CCH) q 26, 507 (S.D.N.Y. Dec. 1, 1989) (finding seven-month delay unreasonable).

future events, would seem contrary to our stated rule: A plaintiff, seeking preliminary relief, must show the present threat of irreparable harm.").

For this additional reason, Boeing cannot show that a preliminary injunction should issue.

**C.    The Balance of Equities Favors Virgin Galactic, Not Boeing.**

While Boeing argues that equity favors an injunction to keep Virgin Galactic "from continuing to benefit from [its] misappropriation" (D.I. 5-1 at 30), the balance of equities actually favors the rightful interests of Virgin Galactic, which would be harmed by entry of a preliminary injunction.  Virgin Galactic is in rightful possession of the Disputed IP under the Master Agreement.  A preliminary injunction would indefinitely prohibit Virgin Galactic from using the preliminary aircraft design it contracted for, and replacing that IP would require Virgin Galactic to pay twice for the same solution.  Having already paid Boeing over $45 million for substandard and incomplete work product, a preliminary injunction would be fundamentally unjust.  On the other hand, Boeing suffers no harm given that Virgin Galactic has not disclosed the Disputed IP to any third party.  Thus, given that Virgin Galactic rightfully possesses the Disputed IP and given the economic loss that Virgin Galactic has and will continue to sustain, the equities strongly favor Virgin Galactic.  For this additional reason, no preliminary injunction should issue in this case.

**D.    The Public Interest Does Not Favor An Injunction In This Case.**

While Virgin Galactic agrees that the public interest favors enforcement of valid contracts, a preliminary injunction in this case would not be in the public interest.  A preliminary injunction here would allow Boeing—the party that did not uphold its part of the contract—to claw back IP that is rightfully owned and/or licensed by Virgin Galactic in violation of the parties' agreement.  Indeed, Boeing does not (because it cannot) allege that the Master Agreement provides it with a remedy to rescind the valid transfer of IP to Virgin Galactic.

Instead, Boeing has put forth a trade secrets theory to **thwart** the proper application of the contract here—at great cost to Virgin Galactic and in a manner that would defeat the essential purpose of the parties' Master Agreement.  Rewarding that extra-contractual argument with a preliminary injunction would be anathema to the public interest.  *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007) ("It is in the public interest to ... enforce valid contracts"); *Johnson v. EquityExperts.org, LLC*, 2020 WL 13605306, at *2 (E.D. Va. Jan. 21, 2020) (finding public interest did not support a preliminary injunction when Defendants' fees charged were based on the terms of contract and "[c]ourts recognize that the public interest is served by enforcement of valid contractual obligations."); *Brown v. Bimbo Foods Bakeries Distrib., LLC*, 2016 WL 9415418, at *6, *9 (E.D. Va. Sept. 13, 2016) (finding factual disputes related to whether contract was breached prevented likelihood of success and finding the public interest favoring enforcement of valid contractual rights would not favor injunctive relief).

## V.    CONCLUSION

For all of the foregoing reasons, Virgin Galactic respectfully asks the Court to deny Boeing's motion for a preliminary injunction.

Although Boeing is not likely to prevail on any of the *Winter* factors, should the Court consider granting Boeing's motion for preliminary injunction, Virgin Galactic would be willing to agree to continue to sequester the Math Models and 262 Document and not share them with any third party except upon 30-days' notice to Boeing and to this Court.

DATED: April 12, 2024                    */s/ Coke Morgan Stewart*

Coke Morgan Stewart (Virginia State Bar #461665)
cokestewart@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone:(202) 383-5300
Facsimile: (202) 383-5414

Brett J. Williamson (*Pro Hac Vice* forthcoming)
bwilliamson@omm.com
Brian M. Cook (*Pro Hac Vice* forthcoming)
bcook@omm.com
Paige R. Hardy (*Pro Hac Vice* forthcoming)
phardy@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA  92660-6429
Telephone:(949) 823-6900
Facsimile: (949) 823-6994

Charles B. Molster, III (Virginia State Bar #23613)
cmolster@molsterlaw.com
The Law Offices of Charles B. Molster, III PLLC
2141 Wisconsin Avenue, N.W., Suite M
Washington, D.C. 20007
Telephone:(202) 787-1312

*Attorneys for Defendant Virgin Galactic, LLC*